UNITED STATES DISTRICT COURT      WESTERN DISTRICT OF WISCONSIN

Andrey Aponte,

    Plaintiff,

v

Dr. Suilene, Dr. Spring, Dr. Heinzl, Dr. Martin, HSU Manager N. White, HSU Manager Anderson, nurse Jeremy Brehm, nurse Joe Reda, nurse Strecker, Lt. Morrison, Sgt. Anderson, Sgt. Tully, John and Jane Does,

    Defendants.

DOC NO
REC'D/FILED  14 C 132
2014 FEB 19 AM 11:02
Case No. _____

PETER OPPENEER
CLERK US DIST COURT
WD OF WI

---

## PLAINTIFF'S 42 USC §1983 COMPLAINT

---

### I. JURISDICTION

1. This court has jurisdiction to hear plaintiff's federal and supplemental state law claims pursuant to 28 USC §1331.

### II. NATURE OF THE CASE

2. This is a civil action by prisoner Andrey Aponte ("Aponte") proceeding pro se alleging that prison officials violated federal and state negligence/malpractice laws in relation to planning for his surgery postop, providing him with medical care/adequate medical care, and conditions of confinement. Aponte continues to suffer from the mistreatment at the hands of the defendants and fears that without judicial intervention he will actually die as a result of such mistreatment for his serious medical needs.

3. Aponte demands a jury trial.

### III. PARTIES

4. At all times relevant Aponte is/was a prisoner imprisoned at the Columbia Correctional Institution (CCI), P.O. Box 900, Portage, WI 53901.

5. At all times relevant Dr. Suilene, Dr. Spring, Dr. Heinzl, Dr. Martin, HSU Manager N. White, HSU Manager Anderson, nurse Jeremy Brehm, nurse Joe Reda, nurse Strecker, Lt. Morrison, Sgt. Anderson, Sgt. Tully, John and Jane Does were employees at CCI located at 2925 Columbia Drive, Portage, WI 53901. All of the defendants are being sued in their individual and personal capacities. All of the defendants were acting under color of law.

-1-

## IV STATEMENT OF CLAIMS

6. On July 28, 2011, Dr. Reynolds performed abdominal surgery on Aponte at the Waupun Memorial Hospital. On August 12, 2011, Dr. John Doe told Aponte that due to his surgery he would not be returning to his prison job as a unit kitchen worker for another 6 weeks. On August 18, 2011, a University of Wisconsin Hospital & Clinics staff member came to CCI and removed the staples placed there after the surgery to close his stomach up.

7. On August 19, 2011, Sgt. Jakusz told Aponte that per HSU Aponte did not have a work restriction from his unit kitchen job despite his objections to work soon after surgery and removal of staples. Thus, on August 23, 2011, Aponte, under the threat of discipline for refusing to work, was forced to work in the kitchen by John Does whereupon lifting a 3-5 gallon crate of milk, Aponte suffered from severe sharp pains in his stomach area where he had his surgery. Aponte sought medical care that day and was told by nurse John Doe that Aponte had "pulled a muscle," and prescribed ibuprofen for his pain. In response to Aponte's written request inquiring who released him back to work, on August 31, 2011, Aponte received a written response from Brehm stating, "Our records show that you were never on any work restrictions." On September 2, 2011, upon reviewing his medical file, Aponte discovered written orders by Dr. Reynolds stating, "Return to work when your doctor indicates: [and] No heavy lifting more than 10 pounds [gallon of milk]." As a result of Suilene, White and John Does failing to provide Aponte with a work restriction but instead forced him to work immediately after major surgery and having staples removed from his stomach, Aponte suffered from a pulled muscle that caused him severe sharp stomach pain, loss of sleep and emotional distress.

8. On September 8, 2011, Suilene ordered that Aponte not do any work. However, on September 8, 2011, Aponte discovered that Jakusz had called HSU and was reportedly told by John Doe that Aponte can work full duty with the exception of pushing food carts. Consequently, under the threat of discipline for refusing to work, Aponte was compelled to perform all of the kitchen duties of washing dishes, lifting food trays and food pans, dumping big buckets of mop water, and stretching at all angles when doing them, all that caused Aponte to suffer from severe abdominal pain, headaches and emotional distress from September 8, 2011, to October 3, 2011.

9. After examining Aponte on October 3, 2011, Dr. Reynolds prescribed/recommended ibuprophen and vicodin for Aponte's abdominal pain. On October 18, 2011, Aponte discovered that the reason why he never received his vicodin was because Suilene "did not agree that vicodin was the necessary treatment for muscle strain two months after his initial surgery." As a result of Suilene's refusal to give Aponte his vicodin, Aponte suffered from extreme abdominal pain and emotional distress from October 3, 2011, to October 17, 2011.

10. On April 24, 2012, Aponte was sent to the University of Wisconsin Hospital & Clinics (UWHC) to be examined by a specialist for complaints about his said abdominal pain. After examining Aponte, the pain specialist recommended a plan of care that included increasing Aponte's pain medication to 1-2 tablets of vicodin. After he was returned to CCI there was one vicodin order for Aponte, thus on April 24, 2012, Aponte wrote HSU asking, "Why am I being denied my pain medication, when a specialist recommended? I be in a lot of pain from time to time." On April 25, 2012, Aponte received a written response from Jane Doe stating, "You continue to receive hydrocodone/APAP 4x 1 day. The MD here only prescribed one tablet based on recommendation from UW." On April 29, 2012, Aponte wrote Suilene and stated, "I would like to know why I'm being denied my medication once again. My pain has not decreased, however, my medication has and I like to know why?" On April 30, 2012, Aponte received a response from Suilene stating, "These are narcotic medications are to be used when you need them very much and they are needed. Not all the time. As a result of Suilene and John Doe's failure to comply with the pain specialist's recommendation, Aponte suffered from extreme abdominal pain from September 2, 2011, to June 20, 2012.

11. On May 5, 2012, at 10:00 p.m., Aponte told Sgt. Beech during his hourly round that he needed medical care because he was feeling really bad. Beech told Aponte to keep him posted. At 11:00 p.m., Aponte told Beech that he needed medical attention due to his ongoing stomach condition. Beech replied that he would inform his supervisor John Doe. At 12:00 a.m. (May 6, 2012), Aponte with tears in his eyes from the pain, begged Beech to see medical staff. Beech replied that he would inform his supervisor John Doe and get back with him. At 1:00 a.m., Beech told Aponte that Lt. Morrison said that the person on call (John Doe) said that Aponte didn't need medical care until morning. Aponte

begged Beech to let him speak with Morrison. Beech replied that he would pass Aponte's message on to Morrison. At 2:00 a.m., Beech told Aponte that Morrison said that he would speak with him at a later time. Dissatisfied with his response, Aponte continued to bang on his door pleading for medical help. Finally, at 3:00 a.m., Morrison arrived at Aponte's door and told him that the on-call nurse Strecker told him that she will see him in the morning, but in the meantime, for Morrison to monitor Aponte. In response, Aponte told Morrison that he couldn't monitor him because he was not medical staff. Morrison agreed but told Aponte that he couldn't send him out because there were no medical staff on duty. Aponte then asked Morrsion was he depriving him of medical care, to which Morrison answered, "Yes."

12. In a decision on Aponte's formal complaint via the Inmate Complaint Review System (ICRS), under Complaint No. CCI-2012-10107, regarding the aforementioned, the ICRS staff confirmed Aponte's complaint based on the following:

> In review of the documentation there is evidence to support that at no time did the nurse speak directly to the patient regarding his medical concerns. The nurse communicated with the officer to obtain medical information. This contradicts DAI 500.00.04 Reporting Inmate Health Concerns to on-call nursing staff. In addition, the nurse failed to document the information obtained using the DOC-3437 Nurse consultation report. The patient, given his recent medical history, would have benefit from this exchange of dialogue. This reviewer recommends affirming this complaint with the modification that the nursing supervisor and the security director review this policy with staff to ensure that it is followed.

13. As a result of being deprived of medical treatment by Beech, Morrison, Strecker and John Doe, Aponte was forced to suffer from sharp, extreme stomach pain and emotional distress thereby ultimately resulting in him having to be rushed to the hospital's emergency room where the medical staff put a tube down his nose and then rushed him to UWHC where he had to stay receiving medical care for 3 days.

14. The emotional distress suffered by Aponte was so severe that he had to seek psychiatric help. According to psychiatric records authored by CCI's psychiatrist Dr. Maier dated October 25, 2012, Dr. Maier noted the following:

This morning, I interviewed Mr. Aponte as my first patient in the PT room at HSU for a scheduled follow-up visit. I found Mr. Aponte despondent. He has decided to go on a hunger strike. He doesn't believe that he can get proper medical care here. He said he was going to either be transferred to another facility or he'd go out in a body bag. He described the circumstances that have been aggravating him, which included a host of concerns regarding his colostomy bag, lack of follow-up for the treatment of his stoma, confusion around appliances and material that he needs to care for himself, being charged co-pays for ongoing medical follow-ups for the same complaint, feeling that the HSU staff are retaliating against him for initiating an ICI, which he won because they shouldn't have charged him a co-pay for an ongoing medical event, and the litany went on.

[....]

In the meantime, I met with the HSU manager and one of the RN's. We were expecting the medical doctor substituting for Dr. Suilene to be here today, and that turned out not to be the case. Nevertheless, the three of us had a multi-disciplinary meeting, and we agreed on the following points. Mr. Aponte had a good record and a good relationship with HSU prior to his surgery. The surgeries have resulted in him having to have a colostomy bag and some ongoing care so that he has been the only ostomy patient here at CCI. There was general belief that he should have gone to UW surgery to the infirmary at Waupun for about five days; instead, that was short-circuited and did not give us time to get the proper materials or to get up to speed on ostomy care. As a result, he became the casualty of our learning on how to do this. Nobody has shared this side of the situation with him, but he's discovered himself that at times we seem to be at odds with each other and that everyone was getting more and more frustrated, and one way he thought that the nurses were showing frustration was to charge him a co-pay, which he would refuse to pay, so that he didn't get medical care but instead left the HSU unit angry, and then of course when he used the ICI to try to get some justice and he won, he began to believe that they were actively sabotaging his care. All of that said, we decided that a meeting with him, we could get things back on the right track, and so we met with him this afternoon. I was part of the interview for about 25 minutes, and we established the following, that if mistakes were made in the past, we can't correct those, but today we can get everything back on track. We are going to have only one nurse work with him, and she has some skill with ostomy patients, and she will do a weekly follow-up until they're not necessary; and that started today. He has reported two little nodules on his stoma that have appeared in the last week or so, and following that examination, I talked with the nurse, and she did document the dimensions of these. It's unclear what they are, but at least she will follow them and he'll have the confidence that a nurse will also be following them and then make a referral to an MD as necessary. [...] At the same time, he is aware that he has another surgery appointment scheduled weeks away, and that it's the expectation that this will be

a pre-surgical assessment which will result in a surgical date probably in the new year so that they can re-connect his bowels and close his stoma. Our goal then is to work with him over what will be between six and eight weeks to have him as surgery ready as possible so they can make the best decision in regard to any future suture. We reestablished the basic therapeutic alliance, and at the end of the meeting, I thought that he was more relaxed, felt more confident that he was being heard. He has agreed to stay on citalopram, which can only be helpful to help him cope with the depressing aspect of this process.

15. Still suffering from emotional distress, Aponte sought psychiatric help again and was seen by Dr. Maier on December 19, 2012, and noted the following:

> I examined Mr. Aponte today in interview room #1 in HSU for a scheduled followup visit. Mr. Aponte appears to be concerned about his medical care, as he was when I saw him last. The issue today is "gloves." He said that they have discontinued his glove, and in fact there is a note dated 12/06/2012, by Dr. Suilene that says dc gloves. There is no progress note to indicate why the gloves were discontinued, and he is fearful that he will lose his gloves forever when he quoted on of the other RNs in a supervisory capacity stating that he could have gloves. He has complained to the warden and apparently done an ICI.
>
> So HSU is not a postop facility. He appears to be the only person right now that has a colostomy. We appear to be having difficulty providing him with the supplies that he needs to keep his colostomy clear and the patient education that is required for him to understand how long a pair of gloves can last.
>
> So after talking with him and talking with one of the RNs that was sort of our point person to look after supplies and then talking with Karen Anderson, the HSU supervisor, it appears to me that he has enough gloves to give himself more than adequate hygiene for his colostomy bag until he is seen in January at the GI clinic. Then hopefully they will write clear instructions that will help guide us in the supplies that he will need in an ongoing way to look after himself hygienically.
>
> There is a danger right now of staff splitting over this issue, which I am trying not to feed into, but today I spent about 1/2 hour on an issue related to gloves to clean a colostomy because they are causing a lot of affect in a patient. I am sure that my hourly rate, aside from everybody else's hourly rate, could buy an excess number of boxes of gloves so that this person could have gloves up to the capacity of what security would allow.
>
> Mr. Aponte and I briefly reviewed his medication. Citalopram,

an antidepressant, is hardly adequate to the task of dealing with his depression in regard to these issues, but it is not able to manage his anger that has arisen because of these issues. Patient education would be very valuable in this situation again.

MENTAL STATUS EXAMINATION. Mr. Aponte is a 47-year-old male who walked in the interview room wearing green prison clothes. He sat in the appointed chair and in an animated way described the problems that he is having cleaning his colostomy bag in an adequate manner. He was told by staff that he does not get gloves because they cost too much. He was also told by staff that a nurse said that he should just wash his hands after looking after himself like everybody else does after they have a bowel movement. These kinds of his statements, which are impossible to trace down, only inflame an already inflamed area.

Of course, the patient has the right to file ICIs and complain to the warden. Those are legitimate means of redress, and he continues to want to be transferred to another facility. I think his judgment is reasonable in this regard. We were not prepared for him postop. He should have gone to the infirmary at Waupun and didn't, and we were surprised by having to care for a person postop that had special needs, and we weren't prepared, in my opinion, to do that. We are still playing catchup on it.

16. On March 3, 2013, at approximately 1:00 a.m., Aponte informed Sgt. Tully that he was in a great amount of abdominal pain. Tully responded that he would let someone know. At Tully's 2:00 a.m. round, Aponte told Tully that he really needed his pain medication or to be seen by a medical professional. Tully responded that he would speak with the on-call nurse. Upon his return, however, Tully informed Aponte that nurse Strecker said that Aponte had maxed out on his medication for the day, thus, he would have to wait until the morning. Aponte then told Tully that he wished to speak with nurse Strecker, which Tully denied. Aponte told Tully that according to DAI Policy #500.00.04 that he's allowed to have face-to-face communications with the nurse. Tully told Aponte, "That's not going to happen." Aponte then told Tully that he would be filing a complaint against him, to which Tully showed Aponte his name tag and said, "Go ahead."

17. In a subsequent decision on Aponte's complaint via the ICRS, under Complaint No. CCI-2013-4691 regarding Tully and Strecker's actions above in paragraph (16), the ICRS staff affirmed Aponte's complaint stating, "Based upon a review of this inmate's complaint, and this Examiner's analysis, the evidence supports a recommendation of affirmed

with no further remedy." As a result of Tully and Strecker's actions, Aponte was forced to suffer from severe sharp pains all night and into the following morning, until approximately 10:00 a.m.

18. On May 24, 2013, Aponte was transferred back to UWHC for a followup from his surgery and complaints of pain. After examining Aponte, the specialist noted the following to CCI's HSU:

> As you know, this is a 47-year old gentleman who has had quite a surgical history. He apparently had recurrent diverticulitis and was taken to the operating room by Dr. Karen Reynolds on July 28, 2011, where he underwent a sigmoid and descending colon resection with a primary stapled anastomosis. In reading through the operative note, it sounds like this operation went fairly straightforward without much difficulty. However, postoperatively the patient developed a significant anastomotic stricture and a fistula between his colon and small bowel. We became involved in his care and on May 31, 2012, Dr. Bruce Harms took him to the operating room and did a revision of the anastomosis and resection of the enterocolonic fistula. All of this came back as just benign without evidence of Crohn disease. He also had a diverting loop ileostomy at that time. We obtained a colonoscopy prior to takedown of his ileostomy in September of 2012 and this was actually quite normal. Dr. Hamms obtained a barium enema in August of 2012, which demonstrated no evidence of anastomatic leak and a well-healed anastomosis. He took the patient to the operating room on February 22, 2013, and took down his ileostomy without incident. The patient did quite well in recovery and was discharged on postoperative day 4. At his first postoperative followup in April, Dr. Harms the patient to be having some continued mild lower abdominal pain. He recommended some diet modification and we are seeing the patient back today to determine if his diet modification has been beneficial. The patient reports that he has had a significant benefit with his diet modification. The diet has consisted of low fiber with supplementation of stool softeners and no soy. He feels that his pain has remarkably improved. He has some mild left lower quadrant pain which is really fairly consistent but completely tolerable. It really does not get much worse. His bowels work regularly and he has nice well-formed stools.
> [....]
> PLAN: At this point, I recommend that the patient continue on with his diet modification, which is low fiber without any soy supplementation. If his pain continues, I might recommend sending him to the gastroenterologists to discuss if this could represent masking of IBS-type symptoms.

19. On July 29, 2013, Aponte was transferred to Divine Savior's Emergency Room to be treated for his **stomach complications**.

20. On August 9, 2013, Heinzl responded to Aponte's complaints of stomach pain, etc. by stating, "I looked at your labs and doctor's notes from the Emergency Room on July 29. These were OK. The CT scan showed

-8-

several hernias. I wonder if these are causing some pain or partial bowel obstruction. Dr. Martin, a surgeon, is working here 10-12 days from now. I scheduled an appointment for him to see you to give advice what should be done."

21. Aponte wrote Anderson stating, "I was seen on 5/24 by UW and 7/29 by Divine Savior, for my stomach pain and both Dr. recommended that I be seen by a GI Dr. However, Dr. Heinzl feels I should wait another two week to see Dr. Martin, for his advice. I am in a lot of pain can you please help speed up the process?" On August 13, 2013, Jane Doe resonded, "You do have the appt. with Dr. Martin," but didn't give him anything for pain.

22. On August 22, 2013, Aponte wrote HSU stating, "Once again I'm asking for some help to control my stomach pain, the Naproxen and tylenol is not doing this; what happened to the meds Dr. Martin told me he was ordering for this? Do I have to suffer with this pain until my appointment?" On August 23, 2013, Jane Doe responded, "MD did not order meds, your offsite will determine different or higher level medications. We can schedule you to see MD again if you would like," but refused to give him anything for pain.

23. On August 20, 2013, Aponte wrote Anderson stating, "I continue to have extreme stomach pain. The tylenol and naproxen is not helping; why do I have to suffer, before I can get some kind of relief? This has been ongoing for months now, can you please give me something for the pain?" On August 20, 2013, Anderson responded, "UW appt to be scheduled."

24. On August 28, 2013, Aponte wrote Anderson stating, "[m]y left side continue to be in pain, and now my right side has a big knot in it that's causing pain all the way down to my groin area. What am I to do about this? Will I be seeing an outside Dr. soon? Help!!" On August 28, 2013, Anderson responded, "Yes," but refused to give him anything for pain.

25. On September 7, 2013, Aponte wrote HSU stating, "My stomach continues to hurt really bad on the left and the right side hurts all the way down into my groins. What am I to do? I was down for a will call on yesterday however, this was cancelled." On September 7, 2013, Reda responded, "Scheduled to be seen in HSU," but refused to give him anything for pain.

26. On September 9, 2013, Aponte wrote HSU stating, "I was issued a pass on 9/6 and 9/9 however, these passes were cancelled; can anyone let me know who cancelled? I am still having a difficult time with my pain."

-9-

On September 10, 2013, Jane Doe responded, "Noted," but refused to give him anything for pain.

27. On September 12, 2013, Aponte wrote HSU stating, "My stomach is hurting so bad, that I have to go on sick cell. Can I please get some kind of help for this pain. Why must I have to endure this kind of pain before I get any kind of help?" ["Sick Cell" is voluntary lock-up for at least 24 hours due to medical reasons.] In response, on September 13, 2013, Jane Doe responded, "Seen today. Upcoming UW appt. very soon," but refused to give him anything for pain.

28. On September 17, 2013, Aponte was transferred to UWHC to be examined by a medical specialist named Greenberg. After examining Aponte, Dr. Greenberg concluded that Aponte would need surgery on his stomach again for hernias. Dr. Greenberg also concluded that Aponte's hernias were the cause of his severe pain problems. Dr. Greenberg informed Aponte that he would be prescribing stronger pain medication than the ineffective naproxen and tylenol.

29. On September 18, 2013, Aponte wrote HSU stating, "Is there any pain medication ordered for me? and will I have a followup with the Dr. here?" On September 18, 2013, Anderson responded, "Tylenol was renewed and MD f/u scheduled. Cont. with nurse instructions from 9/13/13," but refused to give him stronger pain meds per Dr. Greenberg.

30. On September 24, 2013, Aponte wrote HSU stating, "Once again I'm asking for some kind of relief from pain. My stomach hurts from my navel to where my stomach was and into my testiculs, the tylenol and naproxen is not working. Is my surgery scheduled?" On September 24, 2103, Jane Doe responded, "Appt. has been made," but refused to give him anything for pain.

31. On October 1, 2013, Aponte wrote Anderson stating, "I need to see the Dr. about the pain I continue to have, I have not seen the Dr. sinse my UW Madison visit, and I have not gotten anything for my pain. I'm begging for some relief from the pain I'm having please!" On October 1, 2013, Jane Doe responded by checking, "Scheduled to be seen in HSU," but refused to give him anything for pain.

32. On October 4, 2013, Aponte wrote Anderson stating, "I continue to ask to see the Dr. about the pain I have in my stomach down into my groin area, however, I have not seen anyone sinse my UW Madison visit. Why is this and why can't I get anything stronger for my pain?" On October

7, 2013, Anderson responded by checking, "Scheduled to be seen in HSU," but refused to give him anything for pain.

33. On October 7, 2013, Aponte wrote HSU stating, "I have asked to see a Dr. about my stomach pain that's going down into my groin area sinse I was seen at UW on 9/17 however, this has not happen, what do I have to do to see the Dr.? I have written at least 5 to 6x." On October 7, 2013, Jane Doe responded by checking, "Treated today. Refer to psychiatrist," but refused to give him anything for pain.

34. On October 8, 2013, Aponte wrote HSU stating, "I continue to ask to be seen by the Dr. here however, I have not been sinse my UW visit on 9/17. I put in a slip on 10/7 and someone wrote I was treated on that day which is incorrect. Can I please be treated?" On October 8, 2013, Jane Doe responded, "What's your medical issue? Why do you want to be seen for? When anyone anyone has off-site appt. that does not mean you have to be seen by a MD unless off-site orders that. Submit HSR if your having medical problems," but refused to treat him for pain.

35. On October 9, 2013, Aponte wrote HSU stating, "I need to see someone about the pain I'm having in my stomach from my navel, to where my stoma was and into my groin. If I can't be seen can you tell me why?" On October 9, 2013, Anderson responded by checking, "Scheduled to be seen in HSU," but refused to give him anything for pain.

36. On October 20, 2013, Aponte wrote HSU stating, "Can I please get some kind of help or relief from the pain I continue to have in my stomach down in my groin area, because the tylenol is not helping." On October 21, 2013, Jane Doe responded by checking, "MD/DO," but refused to give him anything for pain.

37. On December 31, 2013, Aponte wrote HSU stating, "My stomach continues to have pain on the right side where my stoma was, and on the left, mostly when I have a bowel movement." On December 31, 2013, Anderson responded by checking, "Scheduled to be seen in HSU: MD/DO," but refused to give him anything for pain.

38. On January 14, 2014, Aponte wrote HSU stating, "Why can't I see a Dr. for my stomach pain? I was told by UW Madison that if my stomach should continue to hurt, HSU should see me about this, however, when I let you know I'm hurting nothing is being done. I need to see someone about the pain." On January 14, 2014, Anderson responded by checking, "Scheduled to be seen in HSU: MD/DO," but refused to give him anything for pain.

39. On January 16, 2014, Aponte wrote HSU stating, "Why am I being denied medical treatment? I have written at least 5 times about the stomach pain I continue to have, however, nothing is being done about it. UW Madison told me if this should continue, I should be seen. Due to my medical history, I should have been seen by now. Please answer the question." On January 16, 2014, Jane Doe responded, "Scheduled to be seen in HSU: MD/DO MD appt made," but refused to give him anything for pain.

40. On January 24, 2014, Aponte wrote HSU stating, "With my stomach surgery history. Why is it taking more than a month to be seen about the pain I'm having? I really need help!" On January 25, Aponte received a response from Jane Doe stating, "Multiple 'substitute' MD coverage at this time places MD appts difficult & timely to schedule," but refused to give him anything for pain.

41. It should be noted that in the mist of the aforementioned denials of adequate pain medication, Aponte was transferred to UWHC for surgery for his multiple hernias. On October 31, 2013, Aponte was released back to CCI with doctor's orders of 5 to 15 mg of vicodin for the extreme pain that Aponte was suffering from especially in his left side. Upon his return to CCI, Aponte asked nurse Jane Doe for his pain medicine. She gave him 1 vicodin. When Aponte asked her who is limiting him to only 1 vicodin, especially considering that he just had went through surgery, she gave him a medical sheet stating that he was to receive 5 mgs of vicodin 4 times a day. On November 1, 2013, Aponte asked Dr. Spring why was he not receiving his vicodin except 1 pill at night, which was ineffective. Dr. Spring asked him was he trying to pull one over on her. Aponte told her that he was not and that he needed his pain medicine throughout the day because of the extreme stomach pains throughout the day as well. Dr. Spring then prescribed only an extra vicodin at night, which still proved to be wholly inadequate for the excruciating pains that he was forced to suffer from during the day.

42. As a consequence of Aponte's surgery in July of 2011, he was forced to use an ostomy bag.

43. On July 24, 2012, at 12:00 a.m. during Sgt. Anderson's hourly round, Aponte showed Anderson that his ostomy bag was leaking and therefore needed to be changed. Anderson left and didn't return until his next hourly round at 1:00 a.m. At that time he asked Aponte could he wait until first shift in the morning to change it. Aponte told him that he couldn't and

further explained to Anderson that it was just like soiling his underwear and not being able to change them. Anderson responded that he would let Reda know. Anderson left and didn't return until his next hourly round at 2:00 a.m. At that time Anderson told Aponte that Reda said that Aponte would have to wait to be issued a pass first thing in the morning during 1st shift. Aponte was not seen by HSU staff until 12:30 p.m., when HSU staff told him that whenever there's a leak in his ostomy bag it must be changed immediately.

44. In a decision on Aponte's complaint via ICRS regarding the preceding paragraph (43), the ICRS staff affirmed Aponte's complaint based on the following:

> In review of the patient, he informed the security officer of the problem, the officer notified the nurse, and the patient was told he could wait until morning. This is not acceptable. Recommend affirming the complaint. The nursing supervisor will remind staff that when patients complain about a leaking ostomy when on site that this needs to be addressed and treated timely. [...] Further, this Examiner agrees that the nursing supervisor needs to remind staff about proper procedures in situations like this one.

45 As a result of Reda's conduct Aponte suffered via no sleep, emotional distress and exposure to leaking feces from his ostomy bag.

46. As stated above in paragraph (6), on August 18, 2011, Aponte's staples were removed from his stomach by a UWHC employee. Removal of the staples was extremely painful because Aponte's skin had grown over the staples, which was not supposed to happen. The employee told Aponte that the staples were left in too long.

47. On September 2, 2011, upon reviewing his medical file, Aponte discovered written documentation therein by Dr. Reynolds stating that said staples were to be removed in 14 days. However, Dr. Suilene, White and John and Jane Does didn't arrange for said staples to be removed until 21 days later, that ultimately resulted in Aponte's skin growing over the staples thereby causing him extreme pain and even more pain during their removal due to Aponte's skin growing over them.

## V. CAUSE OF ACTION

48. As a result of defendants' acts and omissions, Aponte was forced to suffer from excruciating stomach pains via his skin growing over the staples, denial of adequate pain management for his abdominal

-13-

problems, interference with off-site doctors' recommendations/prescriptions for pain management, injuries suffered due to being forced to work after his surgery, exposure to inhumane conditions via exposure to his human waste leaking from his ostomy bag, headaches, loss of sleep, and emotional distress, all contrary to state and federal laws.

### VI. EXHAUSTION OF AVAILABLE ADMINISTRATIVE REMEDIES

49. Aponte has exhausted all of his available administrative remedies via the DOC's ICRS on all claims herein.

### VII. COMPLIANCE WITH NOTICE OF CLAIM STATUTE

50. Aponte has filed a notice of claim with the attorney general on claims herein pursuant to Wis. Stat. §893.82.

### VIII. RELIEF

51. Based on the above, Aponte seeks the following:

a. Appointment of counsel;
b. $1,000,000.00 from each defendant in punitive damages;
c. $1,000,000.00 from each defendant in compensatory damages;
d. Court costs.

I declare under penalty of perjury pursuant to 28 U.S.C. §1746 that the above is true.

Dated this 7th day of February, 2014.

*[signature: Andrey Aponte]*

Andrey Aponte, #277163
P.O. Box 900 (CCI)
Portage, WI 53901