IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

ANDREY APONTE,

                  Plaintiff,

     v.

DALIA SULIENE, FERN SPRINGS,
BRADLEY MARTIN, NANCY WHITE,
KAREN ANDERSON, JOE REDA,
TRISHA ANDERSON, MICHAEL MORRISON,
TODD ANDERSON, and CLETUS TULLY,[1]

                Defendants.

OPINION & ORDER

14-cv-132-jdp

---

Plaintiff Andrey Aponte, a prisoner currently incarcerated at the Jackson Correctional Institution, located in Black River Falls, Wisconsin, brings various Eighth Amendment and state-law negligence claims against prison officials for failing to restrict him from work following abdominal surgery and then failing to give him proper medical treatment while he was incarcerated at the Columbia Correctional Institution.

Defendants have filed a motion for partial summary judgment, which I will grant in part and deny in part. I conclude that it is appropriate to recruit counsel to assist plaintiff with the complex medical issues raised in the clams that survive summary judgment. Accordingly, I will stay the proceedings pending recruitment of counsel.

---

[1] The caption has been amended to reflect defendants' full names, plaintiff's voluntary dismissal of his claims against John and Jane Doe defendants, Dkt. 70, and the parties' stipulation to the dismissal of defendant Glen Heinzl, Dkt. 62. I have also amended the caption to reflect the parties' agreement that the defendant known as "Nurse Strecker" in the original complaint is now known as Trisha Anderson. Because there are three defendants with the last name "Anderson," I will refer to these defendants by their full names.

UNDISPUTED FACTS

Plaintiff Andrey Aponte is a prisoner currently incarcerated at the Jackson Correctional Institution. The events in question occurred while plaintiff was incarcerated at the Columbia Correctional Institution (CCI). Defendants were all employees at CCI.

## A. Surgical staples

Plaintiff underwent bowel resection surgery at Waupun Memorial Hospital on July 28, 2011. He was discharged and returned to CCI three days later. The discharging physician noted that plaintiff should return to the clinic for surgical staple removal within 10 to 14 days. Plaintiff was prescribed Vicodin to be taken four times a day for two weeks. Following that, plaintiff was prescribed naproxen for post-surgery pain management.

On August 12, 2011, plaintiff was examined by a prison doctor and he was scheduled for staple removal the following week. An employee called the "Medical Program Assistant Associate" scheduled off-site medical appointments.

Plaintiff's staples were removed without incident on August 18, which was 21 days after his surgery, and 15 days after the date of the discharge order. Defendant Dalia Suliene (a doctor at CCI) supervised the nurse practitioner intern that removed the staples. There is no evidence that plaintiff suffered harm as a result of the delay, because the staples were removed with no difficulty, plaintiff was not in acute distress, and he was noted as "doing well." One week after the staple removal, plaintiff had a follow-up appointment and the incision was healing with no signs of infection.

## B. Work restriction

Defendant Suliene was on vacation from August 1 to August 14, 2011. When she returned to CCI on August 16, she reviewed the hospital's discharge orders for plaintiff. The

2

instructions contained a section titled "Activity," which included a statement saying "Return to work when your doctor indicates." There was a handwritten notation next to "Activity" stating "as tolerated." Dkt. 89-1, at 13. Plaintiff and Suliene met on August 18 for an "off-site follow-up," but they did not discuss work restrictions. Plaintiff says they did not discuss work restrictions because he had not yet been ordered back to work. Suliene did not inform plaintiff of what the discharge instruction sheet said.

The next day, sergeant Jakuse (a non-defendant) noticed that plaintiff had not yet returned to his work assignment. He asked plaintiff if he was supposed to return to work. Plaintiff said he was still having pain. Jakuse called the Health Services Unit (HSU) and was told that plaintiff did not have a work restriction.[2] According to plaintiff, defendant Nancy White (at that point the acting HSU manager) was the HSU staff member on the other end of the line.[3] Jakuse then ordered plaintiff back to work. Although defendants object to some

---

[2] Defendants first object to plaintiff's assertions about what was said in Jakuse's phone conversation "on the grounds that defendants have no personal knowledge of any conversation between him and the Unit Sergeant." Dkt. 108, at 2. That is a nonsensical objection; plaintiff is allowed to put on evidence of events defendants did not witness. They later object on hearsay grounds, but plaintiff is allowed to present evidence on summary judgment that might not be in the proper form, but that could be brought in the proper form at trial. Fed. R. Civ. P. 56(c)(2); *Olson v. Morgan*, 750 F.3d 708, 714 (7th Cir. 2014), *reh'g denied* ("We note that the Federal Rules of Civil Procedure allow parties to oppose summary judgment with materials that would be inadmissible at trial so long as *facts* therein could later be presented in an admissible form." (emphasis in original)). Plaintiff could call Jakuse to testify about the conversation so long as the person on the other end of the line was a defendant (to avoid a hearsay objection for that person's statements), which plaintiff claims is the case.

[3] Plaintiff does not provide adequate evidentiary support for this belief; he attempts to support this fact with a statement in his declaration that Jakuse told him that White was on the other end of the phone line during a *September 8* conversation (discussed further below), rather than the August 19 conversation. He also states that he "personally know[s]" that the HSU manager is the person who responds to "most if not all" of these types of calls, Dkt. 108, at 20, ¶ 61, which is insufficient to show that White was actually involved in the August 19 call. In any event, plaintiff's foundation for this belief is irrelevant because, for

of plaintiff's proposed findings regarding this conversation, *see supra* note 2, I take it to be undisputed that plaintiff did not have a formal work restriction issued by CCI medical staff at that point.

On August 23, 2011, plaintiff pulled a "muscle in the stomach" at his job by trying to lift a "3 to 5 gallon" milk crate. Plaintiff was taken to the HSU and prescribed ibuprofen. Plaintiff submitted several health service requests about his ongoing pain.

Plaintiff saw defendant Suliene on September 8, 2011. Suliene told plaintiff that she would issue a work restriction. Plaintiff confronted Suliene with a copy of his discharge instructions (which plaintiff says he had recently obtained) and asked her why he had not been told about the instructions, and why she had not already issued a work restriction. Plaintiff told Suliene that he was suffering "excruciating" pain trying to perform his job. Plaintiff says that Suliene "appeared to get perturbed and attempted to snatch this document from [his] hands and asked me where did I get it from." Dkt. 108, at 4, ¶ 9. Plaintiff said that he obtained a copy of the document from his medical files and was allowed to keep it. Plaintiff says this made Suliene "even more perturbed." *Id*. at ¶ 10. Suliene asked a nurse whether plaintiff was allowed to possess that record, and the nurse responded that he could, but noted that Suliene was not bound by the off-site provider's recommendation. Suliene "still appeared to be agitated," but told plaintiff that he could return to his unit and that he would not have to worry about work. *Id*., at 5, ¶ 11. Suliene refused to provide plaintiff with anything else for his pain.[4]

---

reasons discussed below, he fails to show that the person conversing with Jakuse acted with deliberate indifference to his medical problems.

[4] Defendants object to this proposed finding as conclusory and argumentative. I disagree. A jury could reasonably infer from this finding that plaintiff asked for more effective pain

Upon returning to his unit, plaintiff told Jakuse that he did not have to work because Suliene had issued him a work restriction. But when Jakuse called HSU, he was told that Suliene issued only a "light activity" restriction, so he could return to work. Plaintiff says that Jakuse later told him that defendant White was the HSU staff member on the other end of the line for that conversation. Plaintiff returned to work the next day and continued to suffer severe pain. Plaintiff continued to file health service requests about this pain. In response to a September 21, 2011, request by plaintiff, Suliene responded that she would make an appointment for plaintiff with the surgeon, but she did not change his medications and did not change his work restriction limiting him to "light activity."

Plaintiff saw Dr. Reynolds, the off-site surgeon, on October 3, 2011. Reynolds diagnosed plaintiff with a "musculoskeletal strain," recommended ibuprofen and Vicodin, and recommended that he not work for two weeks. Suliene placed plaintiff on a full no-work restriction at that point.

## C. Vicodin prescriptions

When plaintiff returned to CCI, defendant Suliene did not allow plaintiff to have the Vicodin recommended by Reynolds. But she increased plaintiff's ibuprofen prescription to 600 milligrams. The increased ibuprofen dosage did not stop plaintiff's pain. Plaintiff filed more health service requests about his medication being ineffective.

Plaintiff had CT scans on November 3, 2011, and March 5, 2012. The second scan showed "changes in the area of the anastomosis."[5] Following the second scan, defendant

---

medication and Suliene denied that request.

[5] An anastomosis is "a surgical connection between two structures. . . . For example, when part of an intestine is surgically removed, the two remaining ends are sewn or stapled together (anastomosed)." "Anastomosis," Medline Plus, https://medlineplus.gov

Suliene prescribed plaintiff hydrocodone-acetaminophen[6] to be taken four times a day, as needed.

On March 17, 2012, plaintiff was hospitalized for left lower quadrant pain and suspected anastomotic leak. He was hospitalized for ten days. Imaging showed a "severe stricture of the anastomosis." Dkt. 89-1, at 37. Plaintiff had procedures to dilate the stricture.

Plaintiff had another off-site visit at UW Hospital on April 24, 2012. The surgeon stated in a letter to Suliene that plaintiff would likely eventually require revision of the prior resection surgery, but for now, he could be treated with dilations of the stricture. The surgeon also stated that "I would like to also have the patient increase his p.r.n. medication for these pain episodes." *Id*. at 37. The doctor's report included a recommendation to "increase pain medication to 1-2 tabs Q6H PRN," *id*. at 35, which I take to mean every six hours as needed. A treatment note from another doctor there included a recommendation stating, "Follow clinic recommendations." *Id*. at 36.

After this visit, Suliene prescribed Vicodin for plaintiff's pain three times per day for three weeks. On April 29, 2012, plaintiff submitted a health service request asking why be was being denied his pain medication. Suliene responded that plaintiff was being prescribed narcotics and that they are to be used when needed and not all of the time. On May 1, Suliene increased his Vicodin to four times per day.

---

/ency/article/002231.htm (last visited August 26, 2016).

[6] I do not take plaintiff to be suggesting that his claims hinge on differences between Vicodin, Norco, or any other blend of hydrocodone and acetaminophen.

**D.  May 5, 2012**

On May 5, 2012, a Saturday, plaintiff reported abdominal pain to Sergeant Beech (not a party to this lawsuit) at approximately 10:00 p.m. Defendant Lieutenant Michael Morrison was the supervising officer on plaintiff's unit during third shift that day.

The parties dispute what plaintiff told Beech. Plaintiff says that he told Beech that he had severe pain in his lower left abdomen, and he was suffering from nausea and vomiting. Plaintiff also said that he had an ongoing medical condition and was being treated with dilation of his colon, and that if he had any complications, he should contact medical staff immediately. Plaintiff says he was "on his knees with tears in his eyes, complaining to Sergeant Beech the pain he was experiencing." Dkt. 107, at 13, ¶ 38. According to defendants, plaintiff denied nausea or vomiting, was able to pass gas and stool, had already taken his medications as ordered, and was able to eat his dinner without difficulty.

Because it was third shift and a weekend, CCI did not have a nurse or doctor on site. The parties dispute the exact process by which defendant Nurse Trisha Anderson was contacted—either directly by Beech or by defendant Morrison. Either way, this communication contravened DOC policy, which stated that the on-call nurse should speak directly with inmates in distress.

After Anderson was informed of plaintiff's symptoms, she decided that plaintiff was not having an emergency. She told either Beech or Morrison to relay to plaintiff that he should rest and take his medications as ordered. Plaintiff suffered increasing pain, and he told Beech on his hourly round that he needed help. Plaintiff stated that he was on the floor on his knees, holding his stomach and in obvious pain.

At about 3:00 a.m., Morrison came to plaintiff's cell and told plaintiff that he would be seen in the morning. Morrison states that if plaintiff had reported worsening symptoms or appeared to be in acute distress, he would have instructed staff to contact the on-call nurse again. Plaintiff states that he told Morrison that his pain was worse and that "he had tears in his eyes due to the pain he was experiencing and was begging [Morrison] to get him some medical assistance due to the pain." *Id.*, at 14-15, ¶¶ 14-15.

Defendant Trisha Anderson was on duty the next morning and examined plaintiff at 8:30 a.m. Defendants say that plaintiff only then told Anderson that he was reporting nausea, vomiting, and headaches. Plaintiff says he had told Beech and Morrison about the same symptoms the night before. Anderson arranged for plaintiff's transfer to the emergency room at Divine Savior Hospital for further evaluation. Plaintiff was diagnosed with a stricture of his intestinal tract. He was transported to UW Hospital.

## E. Ostomy bag

On May 30, 2012, plaintiff had a surgery for a bowel obstruction, after which he required the use of an ostomy bag. Plaintiff returned to CCI about a week later.

Plaintiff's bag was to be changed every three days or more often, as needed. On July 20, 2012, the nurse noted that plaintiff had irritated skin and arranged for him to see an off-site UW physician on July 24.

The night before that appointment, plaintiff noticed that the ostomy bag was leaking. Plaintiff's medical records show that his bag was last previously changed on July 20. Plaintiff says that he told defendant Sergeant Todd Anderson that medical staff needed to change his bag, and that Anderson told him that he would "let someone know." Anderson says that if

plaintiff had reported the issue to him, he would have contacted the HSU, but that he has no recollection of plaintiff reporting a problem with his bag leaking.

About an hour later, on Todd Anderson's next round, plaintiff asked him about help for the ostomy bag. According to plaintiff, Anderson asked him "did [he] really need to change it tonight or could [he] wait until the morning?" Dkt. 108, at 17, ¶ 54. Plaintiff told Anderson that a leaky ostomy bag was like having soiled underwear, and so he indeed needed it changed that night. Anderson told plaintiff that he would talk to defendant Nurse Joe Reda, who was on duty that night.

Reda says that he was familiar with plaintiff's ostomy bag and would have changed it had he been notified. But plaintiff says that, another hour later, Todd Anderson told plaintiff that he talked to Reda and that Reda said that plaintiff should wait until the morning.

Plaintiff's bag was eventually changed the next day when he was taken for off-site treatment regarding the ostomy.

## F.  March 3, 2013

Plaintiff had further abdominal surgery in late February 2013. Defendant Sergeant Cletus Tully was assigned to plaintiff's housing unit overnight from March 2 to 3, 2013. Plaintiff reported pain to Tully at 1:00 a.m. Tully, in turn, contacted defendant Nurse Trisha Anderson, who was the on-call nurse at the time. Tully reported plaintiff's pain and appearance of the incision to Anderson, who informed Tully that plaintiff would be seen the next morning in the HSU.

Tully observed plaintiff's wound and described it as not bleeding, seeping, and with no unusual redness.[7] Trisha Anderson told Tully that plaintiff's pain was consistent with

---

[7] Plaintiff disputes this fact, stating that Tully is not a medical professional. But this

9

normal post-surgical pain. Anderson also advised Tully to tell plaintiff to place a warm, wet washcloth on the incision to alleviate some pain, and to take the medication that was available to him in his cell. Anderson had seen plaintiff about 12 hours earlier for a wound dressing change, and she had no concerns at that time—plaintiff had tolerated the change well.

Plaintiff was scheduled for a follow-up appointment the next day. Anderson saw plaintiff at 12:35 p.m., and plaintiff reported that his pain had resolved after he had a bowel movement. Anderson states that post-surgical constipation and associated pain are not medical emergencies.

**G. Plaintiff's request for pain medication in mid to late 2013**

Defendant Dr. Bradley Martin examined plaintiff on August 19, 2013, and referred him to the UW Surgery Clinic for follow-up care. Martin's notes indicate that plaintiff "would like Vicodin for relief." The parties do not elaborate on the treatment provided by Martin, but I take it to be undisputed that Martin did not provide plaintiff with Vicodin.

Plaintiff continued to suffer pain and sought changes in his prescribed medication. Plaintiff filed a series of health service requests in late August through October 2013. Plaintiff brings claims against defendants Karen Anderson (then the HSU manager) and Nurse Reda for refusing to give plaintiff stronger pain medication. Some of these requests were responded to by staff members other than Anderson or Reda. Plaintiff's August 25 health service request was answered by Reda, who scheduled plaintiff an appointment with a nurse for the following day. Reda also responded to plaintiff's September 7 request: Reda scheduled plaintiff for an

---

testimony is admissible: Tully is free to describe what he saw and make layperson estimates of what "unusual redness" means.

appointment with a nurse, who saw him later that week. Plaintiff's October 5 request was answered by Anderson two days later. She scheduled plaintiff to see a doctor.

Plaintiff had surgery for a ventral hernia on October 21, 2013 and was prescribed Vicodin to manage the pain. Defendant Dr. Fern Springs saw plaintiff on October 31, 2013, upon his return from the hospital. Springs ordered a prescription for "Norco," which is roughly equivalent to Vicodin. Springs also added acetaminophen to assist with pain management. On November 1, 2013, plaintiff had a follow-up appointment with Springs, where she adjusted his medication schedule. On November 12, 2013, plaintiff had a follow-up appointment with a UW physician, who noted that plaintiff's pain was well-controlled.

ANALYSIS

To succeed on a motion for summary judgment, the moving party must show that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Brummett v. Sinclair Broad. Grp., Inc.*, 414 F.3d 686, 692 (7th Cir. 2005). All reasonable inferences from the facts in the summary judgment record must be drawn in the nonmoving party's favor. *Baron v. City of Highland Park*, 195 F.3d 333, 338 (7th Cir. 1999). If the nonmoving party fails to establish the existence of an essential element on which that party will bear the burden of proof at trial, summary judgment for the moving party is proper. *Celotex*, 477 U.S. at 322.

Plaintiff brings Eighth Amendment and negligence claims against defendants for various aspects of his treatment. Some of those claims have already been dismissed by virtue

of the previous dismissals of defendants Glen Heinzl and John and Jane Does. Those dismissals leave the following claims for relief (presented in a slightly different order than in the screening order):

1. Following plaintiff's July 2011 abdominal surgery, defendants Suliene and White did not arrange for removal of the staples from plaintiff's surgical wounds until a week later than directed, causing him severe pain.

2. Defendants Suliene and White decided not to give plaintiff a work restriction and instead forced him to work following the surgery.

3. Defendant Suliene would not give plaintiff the Vicodin that was recommended by Dr. Reynolds.

4. Defendant Suliene did not follow the April 24, 2012, "pain specialist's" recommendation to increase his pain medication.

5. On May 5, 2012, defendants Morrison and Trisha Anderson were aware that plaintiff needed medical help but delayed acting until the next morning.

6. Overnight on July 24, 2012, defendants Todd Anderson and Reda would not arrange for plaintiff's leaking ostomy bag to be changed.

7. On March 3, 2013, defendants Tully and Trisha Anderson were aware that plaintiff needed medical help but delayed acting until the next morning.

8. Defendant Karen Anderson allowed plaintiff to wait two weeks to see a gastrointestinal specialist and did not prescribe anything for his pain.

9. Defendant Martin saw plaintiff but did not prescribe stronger medication for his severe pain.

10. Between August 22 and September 17, 2013, defendants Karen Anderson and Reda refused to give plaintiff stronger medication for his pain.

11. Between September 17 and October 31, 2013, defendant Karen Anderson would not provide plaintiff with stronger medication.

12. After plaintiff's October 21, 2013, surgery, defendant Springs did not allow plaintiff to have the full dosage of Vicodin prescribed by the UW doctor, and defendant Karen Anderson denied his requests for stronger medication.

12

The Eighth Amendment prohibits prison officials from acting with deliberate indifference to prisoners' serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976). A "serious medical need" may be a condition that a doctor has recognized as needing treatment or one for which the necessity of treatment would be obvious to a lay person. *Johnson v. Snyder*, 444 F.3d 579, 584-85 (7th Cir. 2006). A medical need may be serious if it is life-threatening, carries risks of permanent serious impairment if left untreated, results in needless pain and suffering, significantly affects an individual's daily activities, *Gutierrez v. Peters*, 111 F.3d 1364, 1371-73 (7th Cir. 1997), or otherwise subjects the prisoner to a substantial risk of serious harm. *Farmer v. Brennan*, 511 U.S. 825, 847 (1994).

To be considered "deliberately indifferent," an official must know of and disregard "an excessive risk to an inmate's health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Snipes v. Detella*, 95 F.3d 586, 590 (7th Cir. 1996). However, inadvertent error, negligence, gross negligence, and ordinary malpractice are not cruel and unusual punishment within the meaning of the Eighth Amendment. *Vance v. Peters*, 97 F.3d 987, 992 (7th Cir. 1996).

Alternatively, plaintiff alleges that defendants' actions were negligent. A negligence claim under Wisconsin law includes the following four elements: (1) a breach of (2) a duty owed (3) that results in (4) harm to the plaintiff. *Paul v. Skemp*, 2001 WI 42, ¶ 17, 242 Wis. 2d 507, 625 N.W.2d 860.

13

**A.  Plaintiff's claims**

    **1.  Following plaintiff's July 2011 abdominal surgery, defendants Suliene and White did not arrange for removal of the staples from plaintiff's surgical wounds until a week later than directed, causing him severe pain.**

Plaintiff concedes that defendant White, working as acting HSU manager, had no personal involvement in scheduling off-site appointments for staple removal, and that "in any event, he suffered no harm for the one day delay." Dkt. 102, at 2. Although plaintiff alleged that the delay was a week, it now appears that the staples were removed on the fifteenth day after the doctor's letter stating that the staples should be removed after ten to fourteen days.

Plaintiff instead contends that "this failure to act, even if by [White's] subordinate, establishes a[n] on going pattern of showing a deliberate indifference." *Id*. at 3. But this is not how deliberate indifference is proven. If White was not personally involved in depriving plaintiff of an earlier appointment, she cannot be liable under the Eighth Amendment. *See Palmer v. Marion County*, 327 F.3d 588, 594 (7th Cir. 2003) (Section "1983 lawsuits against individuals require personal involvement in the alleged constitutional deprivation to support a viable claim."). Nor can White or anyone else be liable if plaintiff was not harmed by the short delay. This means that summary judgment must be granted to both White and defendant Suliene on this claim.

    **2.  Defendants Suliene and White decided not to give plaintiff a work restriction and instead forced him to work following the surgery.**

In his complaint, plaintiff alleged that a "Dr. Hoffman" told him on August 12, 2011, that he would not have to return to work for another five weeks because of his surgery. But plaintiff does not include this fact in his proposed findings. On the other hand, defendants contend that plaintiff had no work limitation set by the off-site doctor, which misses the

14

point of his claim.[8] Plaintiff's case for having a "serious medical need" is obvious: he underwent invasive surgery in late July 2011, and it stands to reason that his activities would need to be limited. Yet without prison medical personnel issuing a restriction, plaintiff hurt himself lifting a crate, and then continued to suffer pain while having to work following that incident.

When Sergeant Jakuse called HSU to two occasions to ask whether plaintiff had a work restriction, he was informed the first time (perhaps by defendant acting Health Services manager White) that there was no work restriction, and the second time (again by White) that plaintiff had a "light duty" restriction. These responses were technically accurate: no prison doctor had actually issued plaintiff a restriction at the time of the first call, and Suliene had not given plaintiff a full restriction by the time of the second call. Plaintiff wants to call the discharge instruction a "work restriction" and blame White for telling Jakuse that there was no restriction when there actually was, but nothing in the record could lead a reasonable jury to conclude that the discharge instructions were the same thing as a formal work restriction issued by a prison doctor. It is undisputed that White does not issue restrictions herself, so there is no basis for plaintiff to bring any claim against White for his work injury, either by failing to issue a restriction or by lying about the nature of the restriction. Therefore, I will grant defendants summary judgment on plaintiff's work-restriction claims against White.

---

[8] Defendants contend that plaintiff's discharge instructions stated he could return to work "as tolerated," but this is not precisely accurate. The "Activity" section of the form included a handwritten notation stating "as tolerated," but a subsection of the activity section stated "Return to work when your doctor indicates." One reasonable inference from the form is that the off-site doctor expected prison doctors to put a restriction in place.

The fact that the discharge instructions are not actual work restrictions absolves White from liability, but it helps plaintiff's claims against defendant Dr. Suliene. Because Suliene had no reason to think that the discharge instructions would directly protect plaintiff from having to work following the surgery, it became her responsibility to decide whether a restriction was necessary. A jury could reasonably wonder why plaintiff's prison doctor did not discuss work restrictions with him, after he was coming off invasive surgery. Suliene was on vacation when plaintiff returned from the hospital, so she cannot be liable for anything that went wrong during that time period. But she states that when she returned, she reviewed the off-site provider's discharge orders, and she did not issue a restriction.

She states that "[t]here were no recommendations that [plaintiff] be put on a 'no work' medical restriction," Dkt. 99, at 3, ¶ 11, which seems like an attempt to pass the buck to the discharging doctor. But a reasonable jury could conclude that the discharge instructions (1) indeed recommended plaintiff's work be limited in some way; and (2) assumed that the prison doctor would be making a decision on a restriction. And as I will discuss further below, defendants approach the off-site *medication* recommendations as suggestions that are free to be disregarded by the prison physician, who should use her expertise in the prison setting to make prescription decisions. It is unclear why the activity restrictions should be treated any differently. Defendant Suliene's failure to consider a work restriction, regardless of the precise wording of the discharge instructions, could lead a jury to believe that she was deliberately indifferent to the threat of harm to plaintiff.

Plaintiff contends that Suliene's later issuance of a "light duty" restriction following his injury was done out of spite, and he provides details of a curt discussion between the two in an effort to show that Suliene lied to him about issuing a full restriction and was angry at

16

him for producing a copy of the discharge instructions. But I conclude that a jury could not reasonably infer that Suliene acted with deliberate indifference by her actions following plaintiff's injury. Given the evidence plaintiff provides, it strains credulity to think that Suliene actually meant to harm plaintiff despite giving him some type of work restriction, even if that restriction ultimately did not eliminate plaintiff's pain. I will grant defendants' motion for summary judgment as it pertains to an Eighth Amendment claim about the light-duty restriction, but plaintiff's negligence claim about that restriction may proceed.

3. **Defendant Suliene would not give plaintiff the Vicodin that was recommended by Dr. Reynolds.**

4. **Defendant Suliene did not follow the April 24, 2012, "pain specialist's" recommendation to increase his pain medication.**

I will address both of these claims about defendant Suliene's failure to provide plaintiff with adequate pain medication together. In his briefing, plaintiff attempts to broaden his claims to his entire time under Suliene's care following his July 2011 surgery. But his claims are more circumscribed. In an order screening the complaint, the court summarized the allegations on which plaintiff was allowed to proceed:

> Plaintiff met with Dr. Reynolds on October 3, 2011. Reynolds prescribed plaintiff ibuprofen and vicodin. However, plaintiff never received the vicodin because defendant Suliene did not agree that this medication was appropriate for "muscle strain two months after [plaintiff's] initial surgery." Plaintiff continued to suffer from severe abdominal pain and emotional distress.

> On April 24, 2012, plaintiff was sent to the University of Wisconsin Hospital to be examined for his complaints of abdominal pain. The "pain specialist" recommended "increasing . . . pain medication to 1-2 tablets of vicodin" (plaintiff does not say how often). That same day, plaintiff wrote to the Health Services Unit asking why he was not receiving this medication. The next day, he received a response from defendant Jane Doe stating, 3 "You continue to receive hydrocodone/APAP 4x 1 day.

17

> The MD here only prescribed one tablet based on recommendation from UW." Plaintiff wrote to defendant Suliene about the medication, and Suliene responded by stating that the narcotic medication was to be taken "when [plaintiff] need[s] them very much . . . . Not all the time." Plaintiff continued to suffer severe pain.

Dkt. 9, at 3-4. Plaintiff's claims are limited to these events.

Plaintiff contends that he suffered in pain because Suliene would not provide him with appropriate pain medication recommended by outside doctors even after being notified about the ineffectiveness of the existing prescriptions. Defendants contend that Suliene is not bound by the outside doctor's recommendations, and that there are special concerns regarding the provision of narcotic pain medications in prison that give good reasons not to prescribe them liberally. But she does not explain with particularity why she chose the specific course of treatment in plaintiff's individual case. I am wary of granting summary judgment against an uncounseled prisoner on this type of claim where it is possible that expert testimony could show that Suliene's disagreement with outside doctors was not a reasonable one. Accordingly, I will deny defendants' motion for summary judgment on these claims. As discussed further below, I conclude that it is appropriate to recruit counsel for plaintiff to assist him with the complex medical issues raised by these claims.

### 5. On May 5, 2012, defendants Morrison and Trisha Anderson were aware that plaintiff needed medical help but delayed acting until the next morning.

Plaintiff contends that his overnight pain complaint was not treated properly by defendants Nurse Trisha Anderson and Lieutenant Morrison. To some degree, plaintiff takes issue with the method by which his complaint was communicated to Anderson.

18

Defendants' failure to have plaintiff speak directly with Trisha Anderson violated prison policy, but it does not in itself suggest that either Anderson or Morrison acted with deliberate indifference. Rather, defendants' actions (or inactions) in treating plaintiff's problems determine whether a jury could conclude that they were deliberately indifferent. I conclude that there are triable issues with regard to both defendants.

First, I will consider defendant Nurse Trisha Anderson's actions. Anderson did not send plaintiff to the emergency room upon first hearing about plaintiff's pain. Under Anderson's version of the facts, the information she received from prison staff was relatively mild: plaintiff was suffering pain, but not other symptoms like vomiting or nausea, and he was passing gas and stool and had eaten without difficulty. If that version of the facts were undisputed, no reasonable jury could conclude that Anderson was being deliberately indifferent to plaintiff by telling him that he should rest and take his medications, and that he would be seen in the morning.

But those facts are in dispute. Although plaintiff is not in position to know what either Beech or Morrison told Trisha Anderson, under his version of events, he described more serious symptoms—he was doubled over in pain, and was suffering nausea and vomiting. A reasonable jury could infer that Anderson was told this version of events and did nothing about it.

As for plaintiff's claims against defendant Morrison, Morrison contends that he was entitled to rely on the medical judgment of Nurse Trisha Anderson. That is true to a point: Morrison was entitled to rely on Anderson's initial response over the phone for plaintiff's contemporaneous complaints. But he cannot rely on Anderson's initial diagnosis to make later decisions if plaintiff's condition worsened.

Morrison admits that if plaintiff had said his symptoms were getting worse, or if he was in acute distress, he would have instructed staff to call Anderson again. Under plaintiff's version of events, he did tell Morrison that his pain was getting worse and that he was in acute distress—plaintiff says that he had tears in his eyes and begged Morrison to help him. Because a reasonable jury believing plaintiff's version of events could conclude that Morrison acted with deliberate indifference by not doing anything to help plaintiff, I must deny defendants' motion for summary judgment on plaintiff's claims against Trisha Anderson and Morrison. For the same reasons, plaintiff's negligence claims survive summary judgment as well.

### 6. Overnight on July 24, 2012, defendants Todd Anderson and Reda would not arrange for plaintiff's leaking ostomy bag to be changed.[9]

Plaintiff brings claims that defendants Todd Anderson and Reda failed to arrange for his ostomy bag to be changed when plaintiff told them that it was leaking. Defendants at first contend that there is no record that plaintiff notified staff about the leaking bag, but it is not necessary for there to be prison records of the event. Plaintiff gives his firsthand version of the events, and that is sufficient to create disputed issue of fact about what actually happened.

Defendants also contend that any failure to change the ostomy bag was only a slight delay that cannot show defendants' deliberate indifference.[10] But defendants do not develop

---

[9] Plaintiff includes proposed findings about the decision to place him at CCI, where he believed he would not receive adequate case for his ostomy bag, but plaintiff is not proceeding on claims regarding the placement decision.

[10] In their briefing, defendants suggest that the delay occurred between the night of July 24 and July 27. But from plaintiff's complaint and his proposed findings, I take plaintiff to be saying that the leak started the night of July 23 and carried over into July 24, until his bag was changed during an off-site appointment. This is a shorter delay than that contemplated

this argument, and I cannot say as a matter of law that a leaking ostomy bag is not a serious medical need. Nurse Reda concedes that had he known about the leaking bag, he would have changed it. Plaintiff says that Reda *did* know about the problem, but did nothing to help him anyway, from which a reasonable jury might infer deliberate indifference on Reda's part. A jury could alternatively infer that Todd Anderson was made aware of the problem but did not actually speak with Reda, which could be sufficient to support a deliberate indifference claim against Anderson. For similar reasons, plaintiff's negligence claims survive summary judgment.

Moreover, plaintiff might be able to prevail on an Eighth Amendment claim even if the leaking bag did not create a serious medical need. Plaintiff also contends that defendants' decisions to leave him with a leaking ostomy bag "deprived [him] of a basic sanitation requirement," Dkt. 102, at 9, which is more akin to a "conditions of confinement" claim under the Eighth Amendment.[11] To succeed on this type of claim, the plaintiff inmate must show that the alleged deprivation was "sufficiently serious" such that an official's act or omission resulted in the "denial of the minimal civilized measure of life's necessities." *Townsend v. Fuchs*, 522 F.3d 765, 773 (7th Cir. 2008) (citing *Farmer*, 511 U.S. at 834). Here, plaintiff states that he was left by Anderson and Reda to stew in his own waste, which could

---

by defendants in their brief, but my analysis above would be the same regardless the delay was one day or three.

[11] I did not discuss this type of Eighth Amendment theory in screening plaintiff's claims, but it has become apparent through summary judgment briefing that at least part of what plaintiff is complaining about is that he was unnecessarily forced to suffer unsanitary conditions. Although plaintiff's complaint could have been clearer about how he was harmed by inadequate ostomy care, I conclude that this theory can be supported by his allegations. *See Small v. Chao*, 398 F.3d 894, 898 (7th Cir. 2005) (pro se plaintiffs generally not required to plead particular legal theories).

support this type of a claim. *See, e.g.*, *DeSpain v. Uphoff*, 264 F.3d 965, 974 (10th Cir. 2001) ("exposure to human waste carries particular weight in the conditions calculus"), *Fruit v. Norris*, 905 F.2d 1147, 1151 (8th Cir. 1990) ("courts have been especially cautious about condoning conditions that include an inmate's proximity to human waste"). I conclude that plaintiff may proceed to trial on claims that Todd Anderson and Reda acted with deliberate indifference by subjecting him to unsanitary conditions.

### 7. On March 3, 2013, defendants Tully and Trisha Anderson were aware that plaintiff needed medical help but delayed acting until the next morning.

Plaintiff abandons his deliberate indifference claim against Tully, but not his negligence claim. In any event, the undisputed facts show that neither Tully nor Trisha Anderson was deliberately indifferent or even negligent regarding plaintiff's condition on March 3, 2013. The actual medical treatment provided to plaintiff by Anderson was appropriate; she believed that plaintiff's post-surgical pain was normal, and advised that he should sooth the incision with a warm washcloth and take pain medication. She scheduled an exam for the next day. Plaintiff concedes that his pain went away after having a bowel movement, so there is no reason to think that Anderson should have done anything different. The main thrust of plaintiff's briefing on this claim is that he takes issue with defendants failing to follow jail policy by having Anderson speak directly with plaintiff, rather than having Tully relay messages between plaintiff and Anderson. But as stated above, this is not in itself deliberate indifference or even negligence. Because no reasonable jury could conclude that Anderson or Tully violated plaintiff's rights, I will grant defendants summary judgment on these claims.

**8. Defendant Karen Anderson allowed plaintiff to wait two weeks to see a gastrointestinal specialist and did not prescribe anything for his pain.**

Plaintiff alleged that the off-site doctors he saw in May and July 2013 suggested that plaintiff see a gastrointestinal specialist. On August 9, 2013, then-defendant Dr. Heinzl met with plaintiff regarding his complaints of stomach pain and scheduled an appointment for plaintiff to see defendant Dr. Martin, a surgeon, when Martin visited the prison in two weeks. Plaintiff wrote to defendant HSU manager Karen Anderson, complaining about having to wait two weeks instead of following through with the off-site doctor's suggestion that plaintiff see a GI specialist. An unidentified nurse responded by noting that plaintiff had the appointment with Martin scheduled, but she did not prescribe him pain medication.

Neither party addresses these specific events in their briefing or proposed findings of fact. Defendants argue more generally that nurses cannot prescribe medications or set up off-site appointments which plaintiff does not dispute. But it appears that the health services manager was a clearinghouse for inmate medical complaints, and it is possible that plaintiff could prevail on claims against Karen Anderson for failing to direct complaints to someone who could rectify his problems. Without factual elaboration of plaintiff's complaints and Anderson's actions in response, I cannot dismiss plaintiff's claims at the summary judgment stage. Accordingly, these claims survive defendants' motion for summary judgment.

**9. Defendant Martin saw plaintiff but did not prescribe stronger medication for his severe pain.**

Plaintiff abandons his Eighth Amendment claim against "Dr. Bradley," by whom I take plaintiff to mean Dr. Bradley Martin. But he says that he does not abandon his negligence claim.

23

Plaintiff alleges that Martin saw him in late August 2013 but did not prescribe him stronger medication for his severe pain. Martin referred plaintiff to UW surgeons, and plaintiff was seen by other prison medical providers about a week after his appointment with Martin. From those events, defendants contend that Martin's "lack of involvement in [plaintiff's] continued care precludes a finding of . . . negligence on his part" and that "[t]here is nothing in the record to establish that Dr. Martin knew of a serious, ongoing medical need and deliberately disregarded it." Dkt. 87, at 23-24. I disagree with both of these points. Martin's lack of continued involvement should not obscure the fact that he had the opportunity to provide plaintiff with increased pain medication and yet chose not to do so. For reasons similar to those stated above regarding defendant Suliene's provision of pain medication, I will deny defendants' motion for summary judgment on plaintiff's negligence claim against Martin. Recruited counsel should be able to help plaintiff with the complex issues involved in a negligence claim against Martin.

> **10. Between August 22 and September 17, 2013, defendants Karen Anderson and Reda refused to give plaintiff stronger medication for his pain.**

> **11. Between September 17 and October 31, 2013, defendant Karen Anderson would not provide plaintiff with stronger medication.**

Plaintiff brings claims against defendants Karen Anderson and Joe Reda for refusing to give plaintiff stronger pain medication. But they can be liable for Eighth Amendment claims only for their personal responsibility in acting with deliberate indifference toward plaintiff's medical needs. Defendants explain that neither Anderson nor Reda can prescribe medication themselves, and they were not the staff members responding to some of plaintiff's health service requests made from August to October 2013. Given Anderson and Reda's responses to the requests that they did handle, no reasonable jury could say that they acted with

deliberate indifference. In each instance, Anderson or Reda made an appointment for plaintiff so that his concerns could be addressed. Plaintiff's dissatisfaction with the treatment at these later appointments does not support claims against Anderson or Reda.

Nor can plaintiff bring negligence claims against Anderson or Reda. They could not prescribe medications to plaintiff, so they set appointments for plaintiff to pursue his request with other medical staff. No reasonable jury could conclude that they breached a duty to plaintiff.

Plaintiff contends that defendants are not entitled to summary judgment on these pain claims because Karen Anderson and Suliene did not transfer plaintiff to a better location for ostomy care, but that issue is only tangentially relevant to treatment for pain, and plaintiff is not proceeding on claims regarding his prison placement following his ostomy surgery. I will grant summary judgment to defendants on this set of claims.

12. **After plaintiff's October 21, 2013, surgery, defendant Springs did not allow plaintiff to have the full dosage of Vicodin prescribed by the UW doctor, and defendant Karen Anderson denied his requests for stronger medication.**

Plaintiff included allegations about the provision of Vicodin by defendant Dr. Springs, but in his response brief, plaintiff now says that he wishes to abandon his Eighth Amendment claim against Springs. Plaintiff does not formally abandon his negligence claim against Springs, but he does not present any argument concerning that claim, and there are no proposed findings of fact by either party suggesting that Springs acted negligently in providing care to plaintiff. Rather, the facts show that Springs provided plaintiff with "Norco," a medication equivalent to Vicodin, and extra acetaminophen, and at plaintiff's follow-up appointment at UW, plaintiff's pain was described as "well-controlled." Because there is nothing in the summary judgment record suggesting that plaintiff could prevail on a

25

negligence claim against Springs, I will grant summary judgment to defendants on this claim as well.

## B.  Summary

As detailed above, I am granting summary judgment to defendants on several of plaintiff's claims. Here are the claims that survive summary judgment:

- Eighth Amendment and negligence claims against defendant Suliene for initially failing to give plaintiff a work restriction.

- A negligence claim against Suliene for later giving plaintiff only a "light duty" work restriction.

- Eighth Amendment and negligence claims against Suliene for not giving plaintiff the Vicodin that was recommended by Dr. Reynolds.

- Eighth Amendment and negligence claims against Suliene for failing to follow the April 24, 2012, "pain specialist's" recommendation to increase his pain medication.

- Eighth Amendment and negligence claims against defendants Trisha Anderson and Morrison regarding the events of May 5, 2012.

- Eighth Amendment medical care and unsanitary conditions claims, and negligence claims, against defendants Todd Anderson and Reda for failing to change plaintiff's ostomy bag.

- Eighth Amendment and negligence claims against defendant Karen Anderson for allowing plaintiff to wait two weeks to see a gastrointestinal specialist and not addressing his pain complaints.

- A negligence claim against defendant Martin for failing to prescribe him stronger pain medication.

None of plaintiff's claims against defendants White, Tully, or Springs survive summary judgment, so I will remove them from the caption.

## C. Counsel

Plaintiff's remaining claims involve the types of issues that the Court of Appeals for the Seventh Circuit has suggested would benefit from recruitment of counsel or appointment of a medical expert. *See, e.g., Perez v. Fenoglio*, 792 F.3d 768, 785 (7th Cir. 2015) (litigation is "even more challenging in cases, like Perez's, where complex medical evidence (including expert testimony) is needed to assess the adequacy of the treatment received"); *Garner v. Sumnicht*, 554 F. App'x 500, 501 (7th Cir. 2014) ("Under these circumstances, the district court should have attempted to recruit a lawyer for Garner, who appears to be unable to present a case dependent on medical evidence—yet has enough of a substantive claim that the court cannot dismiss it as obviously deficient.").

Although plaintiff has not formally renewed his request for recruitment of counsel, I denied plaintiff's previous motion in part because it was unclear whether the summary judgment record would reveal issues for which counsel might be necessary. *See* Dkt. 85. Because I conclude that plaintiff will not be able to litigate the complex medical issues remaining in this case, I will recruit counsel to represent him at trial. The current schedule and trial date will be stricken and a new schedule set following recruitment of counsel for plaintiff.

Defendants have filed a motion to strike the remaining schedule, which I will deny as moot.

ORDER

IT IS ORDERED that:

1. Defendants' motion for partial summary judgment, Dkt. 86, is GRANTED IN PART and DENIED IN PART as discussed in the opinion above.

2. Defendants Fern Springs, Nancy White, and Cletus Tully are DISMISSED from this lawsuit.

3. The schedule in this case is STRICKEN and proceedings are STAYED pending recruitment of counsel for plaintiff. If I find counsel willing to represent plaintiff, I will advise the parties of that fact. Soon thereafter, a status conference will be held with to establish a new schedule for resolution of the case.

4. Defendants' motion to stay the current schedule, Dkt. 112, is DENIED as moot.

Entered August 30, 2016.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge